Good morning, Your Honors. May it please the Court, Courtney Moran on behalf of the government. The Supreme Court has repeatedly, consistently upheld the constitutionality of the detention of noncitizens during removal proceedings, including the categorical detention without the opportunity for release of certain criminal noncitizens like Mr. Banyee. That detention continues its immigration purposes throughout removal proceedings, specifically to protect the community from further criminal activity and to ensure the noncitizen's appearance at removal hearings and, if ordered to remove, at his removal. Rather than apply this relevant Supreme Court precedent, the district court here employed a multi-factor framework initially set out by another district court and ultimately concluded that Mr. Banyee's detention was unconstitutional primarily because of its length. But the district court's analysis and the framework on which it relied are flawed because they are untethered to the purpose of the statute and they disregard the relevant Supreme Court precedent. This Court should reverse. On the test, just a quick question, and you're going to get into this, I'm sure, but would you just apply the Damore standard from the facial challenge that the Court heard 20 years ago, or does the government propose a different test for analyzing this issue? Well, Damore is certainly the starting point for the test. So in Damore, the Supreme Court held that Section 1226C is facially constitutional because it is serving its purpose throughout removal proceedings. In Jennings, the Supreme Court confirmed that Section 1226C detention lasts throughout removal proceedings. So that is certainly the starting point for the test. In the Court did not address a case like this where a noncitizen brings an as-applied challenge. So for that, we would point you to Justice Kennedy's concurrence in Damore, which still acknowledges that the detention is constitutional as long as it is serving the purpose of removal proceedings. Well, Counsel, right before that, it says brief period necessary. The adjective is brief. As you know, it's in the briefing here. And they also say limited and several other words of that kind. So where does that leave us on how long it can be? Can it be forever? It cannot be forever, but the Supreme Court does say the word brief and the word limited, but it says that the limited period necessary to complete removal proceedings. It doesn't say brief period in isolation. It says the period necessary to complete removal proceedings. So as long as removal proceedings are still ongoing and moving at a reasonable pace and there's no allegation of the status of the BIA appeal in this case. The BIA appeal in this case is still pending. Well, what stage is it? Is it an expedited basis or accelerated basis or any kind of basis? It's not because Mr. Bonney has been released. And so once he was released after the bond hearing that the district court improperly ordered here, his case was transferred to the non-detained docket and thus is no longer prioritized like it would be if he were still detained. But you're arguing he should be detained, right? Yes. Okay. If he is detained, will you get it really accelerated? If he were detained, again, then the Board of Immigration Appeals would transfer his case back to the detained docket, which is prioritized and resolved more quickly than cases on the non-detained docket. Is that years versus decades? Usually it's really hard to say because every case depends on the circumstances, but it could be resolved in a few months versus more than a year. We acknowledge there's certainly a backlog with the cases before the Board of Immigration Appeals, certainly for the cases that are not detained. But the Board does take care to prioritize the cases where the individuals are detained to resolve those as quickly as possible. And so that would have happened here if Mr. Bonney had not been released. I think that Judge Benton is recognizing that because of the volume we have now of illegal immigrants, it's different than it was 21 years ago. In that opinion, and DeMoore, they describe it as brief, limited, and they talk about 60 days, 90 days. Now we're talking about a year or two. And so I think that we're in a different – does the fact that we're in a different world now with people crossing the border and really congested dockets, does that make the constitutional analysis different? I think that those are things that the policymakers are welcome to consider if they want to amend the immigration statutes, but respectfully are not considerations for the courts to assess when determining whether an act of Congress is constitutional, especially where the Supreme Court has a test for assessing whether an as-applied challenge is constitutional. Well, on that test, I want to – reasonably foreseeable, practically attainable. Those are the words that the Chief used in the DeMoore opinion. I asked you earlier, is that the standard you would adopt here? And I'm going to sort of press you on this. Is the DeMoore standard what would also – I mean, it might make sense to bring the facial challenge standard into the as-applied challenge, but maybe the government has something else in mind. For the – sorry, do you mean the reasonably foreseeable that he will be removed? Exactly. Should that be our standard? I'm sorry, I didn't finish the sentence, but yes. So that standard – I'm not sure if you're referring to the Zavidas standard of reasonable foreseeability of removal, which would be not the test to apply in this circumstance where someone is still in removal proceedings, but Zavidas is relevant in the fact that it also emphasizes that detention is constitutional as long as it is serving its purpose. In Zavidas, the court found a constitutional problem with the statute that would have allowed for indefinite detention on the government's reading of it at that time, and the court found that if the government is not taking steps to remove someone for whatever reason, if the person can't be removed, if it's not reasonably foreseeable in the near future that they would be removed, then they can't continue to be detained because it's not  Well, that's what I'm getting at. Is that the government's position that it doesn't serve its purpose if it's not reasonably foreseeable or practically attainable? So no, not here. While someone is in pre-removal order detention, so Mr. Bonney doesn't yet have a final order of removal. His removal proceedings are ongoing. So in this circumstance, the test is whether the removal proceedings are moving along at a reasonable pace. And under Justice Kennedy's concurrence in D'Amour, he sets out if it is shown, if there's evidence or even allegations, there's no evidence or even allegations here that the government wasn't moving the removal proceedings along. So as long as the removal proceedings are moving along at a reasonable pace, the government isn't delaying anything, the government has been presenting reasonable arguments in a to serve its purpose. Well, count me surprised because I thought you were going to make a different argument. I thought, I thought you were, because I'm not sure that they're not the same thing, which I know is a double negative there, but reasonably foreseeable or practically attainable means that they're heading towards the possibility of removal. It doesn't mean he's going to get removed. It means that everything is moving towards the possibility of removal. And I thought D'Amour sort of suggested and Zavita suggested that that might be enough for detention. You're right. There's elements of, are they being held in a way that suggests punishment? Is it, are they making gratuitously bad arguments just to hold, I mean, all of that plays into it, but that sort of also goes to the reasonable foreseeability and practically attainable because the government wouldn't be making bad arguments, I don't think, if they're, if they were headed towards removal. Right. Certainly the, the ultimate underlying purpose of the Section 1226C detention is to secure someone's appearance at removal if ordered removed. And so here, of course, the government is, does believe that it's making reasonable substantive arguments in, in arguing that Mr. Bonney is removable and not eligible for any relief for removal and will ultimately be removed. I don't think that, that answers the, the ultimate question necessarily because the, of the reasonable foreseeability of removal, because that is so hard to assess. As you all were hearing in the last presentation, of course, there are issues that come up regarding the charges of removability and the, the test to be applied in that context. And so as long, but, but as long as that process is still playing out, then the detention remains, the detention corresponding to that process remains constitutional. Counsel, I think I have a similar question as Judge Stras, but I'll come at it from a slightly different way. To me, the key language is something that you referred to earlier from the Supreme Court, and that is, quote, the period necessary for removal proceedings. How do we assess what that period is? And I think the key word there is necessary. So I think that as long as the, again, just taking, taking the Supreme Court at its word and taking Justice Kennedy's concurrence at its word of assessing whether the, whether the government has been engaging in dilatory tactics or acting in bad faith. For example, if the government were to detain someone and not initiate removal proceedings at all for several months, that would be an example of a situation where the government, where the detention is not corresponding to the removal proceedings. The district court here found that the government was not engaging in dilatory actions, but what if the government's not doing anything to delay, but there's simply a big backlog because we have lots of cases, and the backlog produces delays of years? Is that, why isn't that unreasonable? I think that's certainly something that the, the district court in another case could assess as the, as the fact finder if those, if that's a situation that was presented to the district court to show that most cases in, in a circumstance like Mr. Bonney's are resolved in X amount of time or that the government had done something that it doesn't normally do in these types of situations, then certainly that could be something for the district court to consider. But there is no, there's no evidence of that, there's no allegation of that in this case. The government moved very quickly and within two months of his detention, the immigration judge had assessed his removability, had found him removable, Mr. Bonney removable on two grounds, including a ground that he's never contested for having been convicted of two crimes involving moral turpitude, that aside from the aggravated felony charge, the crimes involving moral turpitude charge subjects him to the mandatory detention, and he never contested that ground of removability. So then the government, the government again moved along quickly, the immigration judge very reasonably, Sua Sponte decided to reassess her interpretation of the aggravated felony crime of violence charge after a, a new Supreme Court decision came out that could have affected that, and then ICE reasonably exercised its discretion to take that charge off of the table and then proceed with the crime involving moral turpitude charge and proceed with another aggravated felony theft charge. So the, so then the, after the immigration judge's decision, initially ICE appealed a week later, again moving very quickly, the Board of Immigration Appeals remanded that case a few months later, and then the immigration judge then just a couple months later again issued, issued the final decision so far that's on appeal now, but holding that Mr. Bonney is removable and denying relief. When you came to the end of the sentence, I was going to tell you, well end your rebuttal. Okay, I'll, I'll reserve the rest for rebuttal. Sure. Thank you. Ms. Conigal? Good morning, Your Honors, and may it please the Court. My name is Mai Conigal from the ACLU Immigrants' Rights Project for Petitioner Appellee Mr. Anikpao Banyi. And I want to pick up the conversation that Your Honors were having about DeMorin's Advaitis, but first I would like to just make three quick points on the threshold issue. First, I don't think the parties are very far apart. We agree that due process applies here, and the government seems to concede that there are some cases of mandatory detention that would require an individualized volunteering at some point. And the question for this Court is under what circumstances. Second, we disagree that an extraordinary case is the right test, but even if so, that's what we have here with Mr. Banyi. He was detained for over a year with no end in sight for his proceedings while pursuing a very substantial – So why do I think – why do I have eight months in my mind? Tell me why I thought I got eight months from the brief. Did I just read it wrong? No, Your Honors. The magistrate judge had issued her report and recommendation at eight months, but the district court – when the district court reviewed that decision and said his detention had become unreasonably prolonged, that was at day 380. From – starting at what date? Starting from March 31st, 2021, when he was first detained by ICE. Proceed. Is this timing actually unusual? It was 20 years ago. I mean, I know the Damore case pretty well. I just don't know how unusual it is today. We might be talking about everybody being in this situation because of the backlog and the lack of judges and the lack of, you know, people to litigate the case. And if that's true, then we've got an issue. Your Honor, I think it is unusual for 1226C individuals. As the government has presented in – recently in Jennings, they reaffirmed that in the vast majority of cases, over 90 percent, they're still resolved in under six months. And if you look at ICE's own statistics, fewer than 1 percent of people nationwide are detained for over a year. So we're talking – and that's not – Is that today? Are those current statistics or are those the date of Jennings? Yes, Your Honor. This is according to ICE's own statistics on its website as of January 2024. Thank you. And that's over-inclusive because it doesn't account for different detention statutes. And again, that's nationwide. But we know that 99 percent of cases don't reach this point. And the reason for that, Your Honor, is, as was discussed in Damore and Jennings, the vast majority of people under 1226C are not eligible for relief. So if they don't have any relief available to them, they're going to – they can and will take that deportation order to get out of detention. But somebody who, like Mr. Banyee, has substantial ties to the U.S., who hasn't been back to the Ivory Coast in over two decades, is afraid of going back, a person like that is fighting their case not because they're waiting for a habeas petition to get a bond hearing to get out of detention. They're doing it because they have a substantial claim. And the governance test would upend this. And the government is asking you to count that against the noncitizen for them to pursue a good-faith claim. What do you do, though, about Chief Justice Rehnquist saying in the Damore case that this is just different, that the due process – I know that it's good for Mr. Banyee to be able to argue the due process applies. And it absolutely does. Don't get me wrong. But Chief Justice Rehnquist is equally clear that it doesn't apply in the same way to noncitizens than it does to citizens. And so doesn't that make the analysis a little less favorable towards Mr. Banyee? MS. REHNQUIST We agree with you, Your Honor. The general rule is that you get a bail hearing within 48 hours. That's what citizens get. We're talking about here somebody getting their first hearing, the first time a judge will get to look and see whether or not their detention – their continued detention is justified by flight risk or danger at day 380, over a year. We're talking well beyond the period of time. And that was what Damore was dealing with. Your Honor, it was discussed how it was – it's woven throughout the language of the decision how brief and limited that detention was. And it was based on the government statistics that showed that the vast majority, 85 percent of cases, are resolved in 47 days, the remaining 15 percent in five months. We submit, Your Honor, yes, the statistics might have changed and that they were updated in Jennings. But again, it still shows that the vast, vast majority of cases never reached this point like we are – we have here. MR. REHNQUIST Why not apply the test that the Court gave us in Damore and Zvitas, which is, is it reasonably foreseeable or practically attainable removal? Whether that's – whether removal is – you saw the government kind of run from that It just – it just asks, is this somebody we are – that's foreseeable we are going to remove? Because that's – that's the language they used, they being the Supreme Court in  MS. GONZALEZ Well, Your Honor, I don't think that is the right test, and I'll explain  MR. REHNQUIST Okay. MS. GONZALEZ So first, if you look at Zvitas and Damore, they both clearly say that you can detain if the person is a flight risk or a danger. That's a predicate to whether or not they can be removed. So in Zvitas, there were these regulations that allowed the person to get out of detention if they were not a flight risk or a danger. That was – needed to be found for that person, either flight risk or a danger, before you even get to the question of whether or not their removal is foreseeable. And in Zvitas, I want to be clear, we're not asking for the rule from Zvitas, because their removal was not reasonably foreseeable, so their detention was not serving any purpose, and that's why the remedy there was outright release. Here, we're not saying that pre-removal detention doesn't serve a government interest, nor are we seeking outright release. All we are asking is that there be an individualized inquiry at some point, once we've moved beyond the period that Damore discussed. Damore said for these one and a half, five months, it's okay for us to rest on the presumption that this person is a flight risk or danger. But the problem is that once we've moved beyond that period, because we know due process principles say the longer the detention goes, the more procedural protections there must be to evaluate whether that detention is actually continuing to serve a government interest, and there hasn't been that inquiry here. Yeah. One last question. It sounds to me like you want a flight risk or danger type of inquiry, but how on earth and with all due respect to the district judges in this district, how can MUSE possibly be the right standard? I can't find most of that language for MUSE anywhere in any Supreme Court precedent. I can't even really find it in circuit court precedent. It may make sense, but it kind of comes out of nowhere. So, you know, maybe you're not going to defend all the MUSE factors, maybe you will, but I at least wanted to ask that question. Yes, John, I'll break that. I have two responses. First, we're not asking the district court to look at flight risk or danger. The remedy we're seeking is that the immigration judge gets to look at whether the person has a flight risk or danger, and that happens all the time. Immigration judges conduct bond hearings all the time, as we have an amicus brief from former IJs and BIA members who agree that bond hearings in this context make sense because people like Mr. Banyi have complicated cases and it just doesn't make sense to keep their cases, keep them detained while they're pursuing their relief. And I'll get to the MUSE factor. So the MUSE factor actually doesn't come out of nowhere. It actually tracks what majority of courts of appeals prior to Jennings had done, which was apply a multi-factor test to look at whether detention had become unreasonably prolonged, and if so, then that would trigger a bond hearing from the immigration judge. And I'll note that the Third Circuit, the only circuit to look at 1226C prolonged detention post-Jennings, has a similar test. You look at the length of time, whether or not proceedings are going to end soon, whether the parties have engaged in any dilatory conduct, and the conditions of confinement, and that's the — the MUSE test looks at similar factors. And this is where the government gets it wrong. It's not just about the length of time. That's not dispositive. We think it's the most important. But the district court looks holistically at a case. So this would be different if, for instance, someone was detained for over a year, but they were at the end of their proceedings. But all of this — a lot of what's in the Third Circuit came pre-Demore. That's the problem I'm having with it. And so you're pointing to the Third Circuit, but I mean, I think a lot of those tests, as you mentioned, were pre-Jennings. A lot of them were even — the basis for it was pre-Demore as well. Your Honor, I think you meant pre-Jennings, right? Yes. Herman Santos postdates Jennings. And it looked at its — its pre-Jennings cases and said, Jennings just touched the statutory question. It didn't address a due process one. And looking at our prior cases, our due process analyses were really robust and core to our holding that there was a limit to the statute. So those — that survives Jennings. And for that reason, Your Honor, we think that it's reasonable to do something similar to what the Third Circuit did. And I'll note, Your Honor, the courts of appeals have all agreed that there would be serious due process concerns if you do allow for prolonged detention without any inquiry at some point. And the disagreement pre-Jennings was whether or not to adopt a bright-line rule where the Second and Ninth Circuits were ordering bond hearings at six months. And that — and that was it. The other circuits engaged in much more of a holistic look at the case. And that's what the government argued was what should be done were as-applied challenges raised in habeas petitions in Jennings. And if you want to read anything to what the Supreme Court did was to — to allow for that approach, which is what we've had here. All the district courts — in this circuit, the district courts are — unanimously agree that there must be a limit to DeMoor. Length of time matters. We'll look at it in conjunction with these other factors. And the government has not pointed to any problems for the district courts applying this test for the last five-plus years. And all we're asking is that you affirm this very searching test that Judge Schultz adopted in — in the Moussa case, similar to the one that Judge Bibas reaffirmed in Herman Santos. Scalia. Counsel, the sixth factor, the likelihood that removal proceedings will result in a final order of removal, that one seems truest to me with what the Supreme Court's been saying in all of its cases. And it seems to me like I know our instinct is to say, well, how long has it been? But why shouldn't that be the most important factor by the Supreme Court's standard and by the Supreme Court's cases? Well, Your Honor, I think I have two responses. First, on the practical terms, it's — it's very difficult for district courts to ascertain the likelihood of somebody filing — I thought IJs were going to be doing this hearing. Immigration IJs were going to be doing a hearing. No, I'm sorry, Your Honor. I apologize if there's any confusion. There are two inquiries. First is what the district court looks at, which is the six-factor test for Moussa. And that includes likelihood of a final order. If the noncitizen prevails at that stage and gets a bond hearing, at that point, then the immigration judge will look at the case and say, is this person a flight risk or a danger? Do they need to be detained? Or can they be released? Can they be put out — released on bond, an ankle monitor? So those are two separate inquiries. So — Why should they be separate? I know I'm simple-minded, but why should they be separate? I think, Your Honor, it's because someone — the purpose of immigration detention, we know clearly from the Supreme Court, is that it has to prevent flight risk or danger. That's the core of it. And if — so, yes, we can look to likelihood of a final order, maybe as a proxy, but it's not a perfect one. Someone can still comply, can still stay out of danger, even if they might ultimately not prevail in their proceedings. So I don't think it maps on perfectly well. And again, it's asking the district courts to engage in a complicated inquiry that they've been very reluctant to do. I'll note we did a survey of the district courts. And most of the time, I think in the majority — the entire time, they found that factor neutral because they found it difficult to figure out, because these are honestly complicated cases. Mr. Benney's case raises an issue of categorical approach, which, as Your Honor's heard this morning, is complicated. So the district courts are very reluctant to try to figure out who has the better hand in this. And the more fundamental question is, does this person need to be detained while we're And as Judge Biba said, detention can still go — become arbitrary, even if all the parties are acting in good faith. It's just — the proceedings just take time. And the fundamental question is, is it fair for this person to be locked in a jail cell without anyone ever having looked to see whether that's serving any government interest for that entire period of time? And that's all we're asking for. I know that I'm running out of time, so I do want to make sure I address the burden and standard of proof question. If you have any questions. Roberts, let me ask you about that. So there were congressional fact findings underlying 1226C that noncitizens that were subject to removal were flight risks and were likely to repeat as offenders if not detained. In light of those congressional fact findings, why shouldn't the burden of proof be on the detainee, perhaps a rebuttable presumption? Your Honor, because that would contradict the Supreme Court precedent about what who should bear the burden and the standard of proof when the government is seeking to deprive somebody of something more important than money. And I acknowledge that — That would be true for citizens, but the Supreme Court has said repeatedly that deportable criminal aliens have a lesser entitlement to due process. Your Honor, the Supreme Court hasn't addressed a case like this about what burden and standard of proof would apply in this kind of proceeding where we're talking about prolonged detention. So it's a more important liberty interest. The risk of error — the risk of erroneous deprivation is higher. And we know for this group, the government has the means and opportunity to find information about this person if they're really concerned about flight risk and danger. And I'll close by just noting that in this case, Your Honors, the immigration judge looked at Mr. Benny's facts, saw that he was not a flight risk or danger, detention was not necessary, released him in bond. If the district court had not intervened, he could very likely still be detained today. And we ask you to join the other courts of appeals and affirm that someone like this needs an inquiry at some point in their detention. Thank you. Thank you. Ms. Moran. Your Honors. First, regarding whether the timing here is unusual, I think that statistics are a tricky business to get into. But I will — regarding the — when Mr. Benny filed his petition at four months of detention, that certainly was not unusual. And according to the former board and immigration judge members' amicus brief, the and the charge of removability that are involved before the immigration judge. And so for Mr. Benny, there was no — there's no evidence that his situation was outside of the normal circumstances for someone in his situation. The MUSE test is not appropriate, as you noted, Your Honor. The — it's not based in any Supreme Court case law. It's not based in the statute or the purpose of the statute. Mr. Benny concedes that detention during removal proceedings serve some purpose, and he doesn't explain why that detention suddenly stopped serving its purpose at some specific period of time, even though the government is continuing to act reasonably, continuing to pursue the removal proceedings, and continuing to eventually come to a removal order. Now, arguably, it is — it is consistent with Matthews v. Eldridge, our sort of big procedural due process case. But at that point, then you ask the question, why aren't they just applying Matthews v. Eldridge rather than the MUSE test?  BENNY BENNETT Sure. We don't — we don't think that the Matthews test needs to be applied here, but we think that the government would prevail under that test as well because of the strong government interest in enforcing its immigration laws, in securing someone's removal once they are released. The interest in someone remaining out of custody is great, but for someone like Mr. Benny, who has conceded removability and has been convicted of serious crimes, his liberty interest in remaining free at will in the United States is much lower than someone who — a citizen, for example, who would have that liberty interest. If there are no further questions, we would ask that the Court reverse the district court's flawed judgment. Thank you. Thank you, counsel, for the —